# IN THE COURT OF APPEALS OF IOWA

No. 14-0350
Filed September 10, 2015

**STATE OF IOWA,**
       Plaintiff-Appellee,

**vs.**

**ALFRED ANTHONY GALLARDO,**
       Defendant-Appellant.
_____

       Appeal from the Iowa District Court for Polk County, Eliza J. Ovrom (suppression motion), Rebecca Goodgame Ebinger (trial), Judge.


       The defendant appeals his convictions for possession of a controlled substance and failure to possess a tax stamp. **REVERSED AND REMANDED.**



       Angela Campbell of Dickey & Campbell Law Firm, P.L.C., Des Moines, for appellant.

       Thomas J. Miller, Attorney General, Katie Fiala, Assistant Attorney General, Louis S. Sloven, Student Legal Intern, John P. Sarcone, County Attorney, and Joseph Crisp, Assistant County Attorney, for appellee.


       Considered by Tabor, P.J., and Bower and McDonald, JJ.

**PER CURIAM,**

Alfred Gallardo appeals his convictions of possession of a controlled substance, morphine, in violation of Iowa Code section 124.401(5) (2013), and failure to possess a tax stamp, in violation of Iowa Code sections 453B.3 and 453B.12.  On appeal, he claims the district court erred in denying his motion to suppress evidence.  He also claims there is insufficient evidence to support his convictions, the district court committed instructional error, and the district court erred in admitting improper opinion evidence.

I.

Gallardo lives with his mother and stepfather and serves as their caretaker.  On February 2, 2013, Gallardo and his mother went to a Hy-Vee grocery store in Des Moines.  Gallardo and his mother each purchased and paid for their own groceries.  Gallardo placed his groceries on the floor of the back seat of their sedan and separately placed his mother's groceries on the back seat to distinguish them.  Gallardo drove his mother to their home on the east side of Des Moines, and he brought her groceries inside.  Afterward, Gallardo drove to his girlfriend's apartment.  Although Gallardo lived with his mother and stepfather, he also stayed with his girlfriend at her residence in Pleasant Hill.

According to Gallardo, while driving to his girlfriend's apartment, he noticed a pill bottle on the floor of the car with his mother's name on it.  The pill bottle contained morphine pills.  He claims he called his mother and told her that her prescription had been left in the car and that he would drop it off later.  The mother attempted to testify to this at trial.  The district court disallowed the

testimony, but Gallardo was allowed to make an offer of proof. The offer of proof showed the mother would have corroborated Gallardo's story.

At some point later in the evening, Taylor Stacey called Gallardo and asked him for a ride to the Target store. Gallardo testified that he and Stacey were platonic friends. He testified he often gave Stacey rides because she did not own a car. On this night, Stacey was at the American Inn, a hotel on the northwest side of Des Moines known for drug activity. Gallardo testified that he drove from his girlfriend's apartment to the American Inn to give Stacey a ride. He testified he planned to deliver to his mother her medication when he returned to his girlfriend's apartment. On the drive to the American Inn, Gallardo called Stacey and asked if he could use the restroom in her hotel room before they went to Target.

Somewhere around this time, officers responded to an anonymous tip that there was drug activity in the American Inn hotel room where Stacey was located. The officers performed a consensual search of the room and discovered white powdered crystals that appeared to be methamphetamine. They also discovered a needle and a spoon. Stacey, who appeared to be under the influence of opiates rather than methamphetamine, admitted that she regularly used opiates. Her drug of choice is morphine or Oxycontin.

Gallardo arrived at the hotel room while the search was being conducted. Stacey opened the door, and the officers immediately performed a *Terry* stop. At a subsequent suppression hearing, the officer initiating the stop testified that he asked Gallardo whether Gallardo had anything illegal on him and that Gallardo

responded that he had pills in his pocket and handed the pill bottle to the officer. The pill bottle had Gallardo's mother's name on it, and it contained twenty morphine pills. The officer continued to question Gallardo, who explained that he was returning the pills to his mother. The officer testified that Gallardo's story did not make sense given the timing, the location of the hotel, and the proximity of the hotel to the Target store (across the street). Gallardo testified the officers grabbed him while he was still standing in the doorway, pulled him into the hotel room, and handcuffed him behind his back. He testified the officers found the pills upon conducting a search of his pockets.

Gallardo was arrested and charged with possession of a controlled substance with the intent to deliver, as well as failure to possess a tax stamp. Gallardo moved to suppress "any and all evidence resulting from [his] search and seizure," arguing there was no valid *Terry* stop or any other legal basis for the search and seizure of his person. The trial court denied the motion after a hearing. The case proceeded to a jury trial, and the jury found Gallardo guilty of the lesser included offense of possession of a controlled substance, as well as the tax-stamp charge. He was sentenced to one year in prison on the possession charge and five years in prison on the tax-stamp charge, with the sentences running concurrently. Gallardo timely filed this appeal.

## II.

Gallardo challenges the trial court's denial of his motion to suppress, arguing it violated his right to be free of unreasonable search and seizures under the Fourth Amendment of the United States Constitution and Article I, section 8

of the Iowa Constitution.  Specifically, Gallardo contends the search of his person did not fall into one of the exceptions to the warrant requirement because the officers did not have a reasonable suspicion he was involved in criminal activity. We review this claim de novo.  *See State v. Lowe* 812 N.W.2d 554, 566 (Iowa 2012).

A citizen's constitutional right to be free from unreasonable searches and seizures does not prohibit police from temporarily detaining an individual when there are reasonable grounds to believe criminal activity is afoot.  *State v. Dewitt*, 811 N.W.2d 460, 468 (Iowa 2012).  This type of seizure, commonly known as a *Terry* stop based upon the Supreme Court's holding in *Terry v. Ohio*, 392 U.S. 1, 30 (1968), allows police to confirm or dispel suspicions of criminal activity through reasonable questioning.  *Dewitt*, 811 N.W.2d at 468.  In addition to conducting questioning, "[p]olice are allowed to pat down a suspect if they have reasonable suspicion that a crime is being or is about to be committed."  *State v. Bergmann*, 633 N.W.2d 328, 332-33 (Iowa 2001).  The test determining the constitutionality of a *Terry* stop and frisk is one of reasonableness, based on what is reasonable under the particular circumstances at the time of the stop.  *Id.*

Whether a reasonable suspicion exists is determined by using an objective standard: whether the facts available to the officer at the time of the stop would lead a reasonable person to believe that the action taken by the officer was appropriate.  *See State v. Kinkead*, 570 N.W.2d 97, 100 (Iowa 1997). The facts articulated by the officer must support the intrusion on the individual's privacy and the scope of the intrusion must be related to the circumstances that

justified the intrusion. *See id.* It must be more than a hunch, suspicion, or gut feeling. *See id.* Ultimately, whether reasonable suspicion exists must be determined in the light of the totality of the circumstances confronting the officer. *State v. Kreps*, 650 N.W.2d 636, 642 (Iowa 2002).

We need not resolve the conflict between the officer's testimony and Gallardo's testimony regarding the sequence of events. Even if Gallardo is to be believed, we conclude the totality of the circumstances gives rise to a reasonable suspicion of criminal activity sufficient to justify the stop and frisk. Gallardo argues his mere presence in an area known for narcotics trafficking is insufficient to create the reasonable suspicion necessary for a *Terry* stop, citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Nor is it reasonable, he argues, to infer that a person who talks to drug addicts is engaged in the criminal traffic of narcotics. *See Sibron v. New York*, 392 U.S. 40, 62 (1968). There are numerous other facts and circumstances present here, however, that make the present case distinguishable. In addition to the hotel being known for drug activity, the officers had a tip concerning drug activity in the room Stacey occupied. The officers discovered narcotics in the room before Gallardo arrived. Stacey initially claimed the narcotics belonged to a male who had just left the room. Gallardo knocked on the door to Stacey's room during the investigation. One of the officers testified it is "quite likely" that a person who arrives at a location known for drug activity during the execution of a search warrant "is either seeking drugs or may possess drugs themselves." When he arrived at the room, Gallardo exhibited the mannerisms of someone who is under the influence of methamphetamine:

"tweaky body mannerisms with his arms and hands," profuse sweating at his hairline despite it being a cold February day, a rapid speech pattern, rapid blinking, and a jaw-clenching mannerism. Because the totality of these circumstances provides reasonable suspicion, we affirm the denial of Gallardo's motion to suppress. *See Wardlow*, 528 U.S. at 124-25 (holding the defendant's presence in area of heavy narcotics trafficking, coupled with his unprovoked flight upon noticing the police, provided reasonable suspicion to justify a *Terry* stop); *United States. v. Mason*, 628 F.3d 123, 129 (4th Cir. 2010) (noting that although "each component that contributes to reasonable suspicion might not alone give rise to reasonable suspicion," "the existence of reasonable suspicion is a case-specific inquiry based on the totality of the circumstances").

### III.

Gallardo challenges his convictions by raising an "ultimate user" defense, which he argues is an exception or defense to the possession statute. Although the State alleges Gallardo failed to preserve error on this issue, we disagree. This issue was raised before the start of trial when the State objected to Gallardo's mother testifying, arguing that there is no recognized legal defense to possession of a prescription drug that is in someone else's name. Gallardo's trial counsel resisted and the trial court forbade Gallardo from arguing possessing another's prescription is not illegal. The issue was again raised at the close of trial, when counsel objected to the jury instruction on the elements of possession of a controlled substance. Counsel also raised the issue in his motions in arrest of judgment and for new trial, arguing Gallardo was not guilty because he was in

possession of his mother's medication, for which she had a valid prescription. Although Gallardo never specifically referenced the term "ultimate user," we find he has sufficiently preserved error for our review.

Gallardo's argument regarding the "ultimate user" exception is raised first as a challenge to the trial court's rulings on his motions for judgment of acquittal and new trial. Specifically, Gallardo argues the State failed to rebut evidence he was an "ultimate user," which entitles him to judgment as a matter of law. *See State v. Gibbs*, 239 N.W.2d 866, 869 (Iowa 1976) (holding that once a defendant has produced some evidence an exception to the statute applies, the burden shifts to the State to negate the exception beyond a reasonable doubt). Gallardo also alleges the trial court erred in forbidding him from making any argument that "possession of someone else's prescription is not illegal" and in not instructing the jury regarding the "ultimate user" exception. The resolution of Gallardo's claim, however styled, requires us to resolve two issues. First, was there substantial evidence in the record to support the ultimate user exception? Second, does Iowa law recognize such a defense?

Turning to the first issue, the State contends Gallardo's claim that he was in possession of the morphine pills to return them to his mother is self-serving and not credible and Gallardo thus should not have been able to present the defense even if Iowa law allowed it. That is not the relevant standard. We review challenges to jury instructions for the correction of errors at law but review the related claim that a requested instruction should have been given for an abuse of discretion. *State v. Guerrero Cordero*, 861 N.W.2d 257-58, 431 (Iowa

2014). When weighing sufficiency of the evidence to support a requested instruction, we construe the evidence in the light most favorable to the party seeking submission. *Id.* at 258. The court is required to instruct the jury on the law for all material issues raised by the evidence in a case. *Id.* at 260. Where the defendant timely requests an instruction on a theory of defense, the theory is supported by the evidence, and the instruction is a correct statement of the law, the instruction must be given. *Id.*

We conclude there was sufficient evidence to support submitting the defense to the jury. Gallardo and his mother would have testified that he was in lawful possession of the pills to return them to his mother, the "ultimate user." His story may or may not be believable. It is equally likely that Gallardo had an unlawful purpose for bringing the pills with him to the American Inn on the night in question, namely to trade them with Stacey for other drugs. However, the evidence supports either finding, and the question of whether the "ultimate user" exception would apply to the facts of this case is a matter for the factfinder to decide. *See State v. McClelland,* 162 N.W.2d 457, 461 (Iowa 1968) ("It is the function of the jury, not ours, to decide disputed questions of fact, including permissible inferences to be drawn therefrom . . . .").

Because the issue was raised to the trial court and the evidence supports the "ultimate user" exception, the question we must next address is whether an "ultimate user" exception is a correct statement of law. In other words, we must determine whether an "ultimate user" exception exists. The "ultimate user" exception has not been explicitly addressed in Iowa. The issue was discussed in

*State v. Clark*, No. 04-1684, 2006 WL 468476, at \*3-4 (Iowa Ct. App. Mar. 1, 2006). In that case, the defendant argued there was insufficient evidence to support his possession conviction because the prescription pills found in his vehicle belonged to his girlfriend's mother, with whom he lived. *Id.* The court found sufficient evidence supported the defendant's possession conviction on facts distinguishable from Gallardo's situation. *Id.* at \*4. While the prescription holder was a member of the defendant's household, they resided in Florida and the prescription holder was not in the car with him when it was stopped in Iowa. *Id.* The defendant also admitted he sometimes used the prescription medication to help him sleep, which is not a valid use because the prescription was not issued to him. *Id.* *Clark* thus did not expressly decide the existence of an "ultimate user" exception to a possession charge.

We turn to the language of chapter 124. *See State v. Slutyer*, 763 N.W.2d 575, 581 (Iowa 2009) (stating the "primary rule of statutory interpretation" is to give effect to the intention of the legislature, which is ascertained by looking to the language of the statute). The code provides, "It is unlawful for any person knowingly or intentionally to possess a controlled substance unless such substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of the practitioner's professional practice, or except as otherwise authorized by this chapter." Iowa Code § 124.401(5). While the possession statute does not directly reference an "ultimate user" exception, it does provide that one may lawfully possess a controlled substance obtained pursuant to a valid prescription or "as otherwise

authorized by this chapter." Iowa Code § 124.401(5). In the definitions provided for chapter 124, an "ultimate user" is defined as "a person who lawfully possesses a controlled substance for the person's own use or for the use of a member of the person's household." *Id.* § 124.101(30). Iowa Code section 155A.3 provides, "'Ultimate user' means a person who has lawfully obtained and possesses a prescription drug or device for the person's own use or for the use of a member of the person's household or for administering to an animal owned by the person or by a member of the person's household." The term "lawful possession" is not defined in chapter 124, leading to some ambiguity regarding what situations a household member may possess a controlled substance. If a statute is ambiguous, we determine the intention of the legislature by considering:

> "(1) the object sought to be attained, (2) the circumstances under which the statute was enacted, (3) the legislative history, (4) the common law or former statutory provisions, including laws upon the same or similar subjects, (5) the consequences of a particular construction, (6) the administrative construction of the statute, and (7) the preamble or statement of policy."

*Carolan v. Hill*, 553 N.W.2d 882, 887 (Iowa 1996) (quoting Iowa Code § 4.6).

What is now chapter 124 of the Iowa Code was originally adopted from the Uniformed Controlled Substance Act (UCSA). *See State v. Rasmussen*, 213 N.W.2d 661, 665 (Iowa 1973). The express purpose of the act is "to achieve uniformity between the laws of the several States and those of the Federal government." *Id.* (quoting Prefatory Note to Uniform Controlled Substances Act (1970)). We presume that in adopting the UCSA, the Iowa legislature "intended to come within the scheme of complementary federal-state control of the

distribution of drugs and to create an 'interlocking trellis' to assure effectiveness of the Act." *Id.* To this end, we should construe chapter 124 in conjunction with decisions from other states that have adopted the UCSA and look to similar federal and state statutes for guidance in interpreting any of its provisions.

Missouri adopted the same version of the UCSA as Iowa. *See State v. Morrow*, 535 S.W.2d 539, 542 (Mo. Ct. App. 1976) (noting Missouri adopted the Uniform Controlled Substances Act in 1971). Its definition of "ultimate user" is substantially similar to the definition found in Iowa law. *Compare* Mo. Rev. Stat. § 195.010(40) (defining an "ultimate user" as "a person who lawfully possesses a controlled substance or an imitation controlled substance for his own use or for the use of a member of his household or for administering to an animal owned by him or by a member of his household") *with* Iowa Code § 124.401(30) (defining an "ultimate user" as "a person who lawfully possesses a controlled substance for the person's own use or for the use of a member of the person's household or for administering to an animal owned by the person or by a member of the person's household"). The Missouri Supreme Court has interpreted the definition "to allow a household member to possess or control the prescriptions of another household member" so long as the use of the prescribed substance remains lawful. *See State v. Blocker*, 133 S.W.3d 502, 505 (Mo. 2004). In other words, "a son could lawfully retrieve a prescription drug for his bedridden father," but "[l]awful possession would cease if the son used the drug himself or transferred it for use by another person." *Id.* In reaching this conclusion, the Missouri

Supreme Court noted the "absurd" results that could be reached if the ultimate user exception did not exist.

> For instance, if spouses share and have joint control over a medicine cabinet, the spouse without the prescription could be charged with illegally possessing a controlled substance prescribed to the other . . . .  However, by including household members among those who may lawfully possess or control substances prescribed to another household member, the General Assembly exempted household members from prosecution for prescription drugs because each household member's possession or control arises "pursuant to" a prescription.

*Id.*

Utah, which also adopted the UCSA in 1971, *see* Vol. 9, Pt. II, Uniform Laws Annotated, Master Edition, also provides a similar exception to its possession statute.  *See State v. Miller*, 193 P.3d 92, 95-96 (Utah 2008).  While not referred to as an "ultimate user" exception, it provides an exception for the type of "innocent possession" that exists where a person temporarily possesses a controlled substance for the purpose of returning it to its lawful owner.  *See id.* In so finding, the Utah Supreme Court noted that strictly construing the term "possess" to include every type of possession would lead to "absurd prosecutorial possibilities."  *See id.* at 96.

> A daughter who no longer lives at home but who picks up her sick mother's prescription medication and drives it to her mother's home, for example, could be guilty of felony possession under a strict construction of the term "possess."  And, as this case demonstrates, a house guest who inadvertently leaves a prescription bottle of pills at a homeowner's home creates an impossible situation for the homeowner wherein she could do nothing short of immediately fleeing her home to avoid "possessing" the pills.

*Id.* Even though the Utah Controlled Substance Act provides a definition of "ultimate user" nearly identical to that found in the Iowa Code, *see* Utah Code Ann. § 58-37-2(1)(pp) (West), the Utah Supreme Court did not cite it or limit its holding that "the possession statute implicitly includes the defense of innocent possession" to only "ultimate users." *See Miller*, 193 P.3d at 96. However, in addition to proving the controlled substance was "attained innocently and held with no illicit or illegal purpose," Utah's "innocent possession" defense requires a person take "adequate measures to rid [one]self of a controlled substance as reasonably as possible." *Id.* at 97.

Other states have noted similar defenses for an ultimate user or innocent possession. *See Walker v. State*, 358 So. 2d 800, 808 (Ala. Crim. App. 1978) ("It should be noted that possession of a controlled substance by an 'ultimate user or person in possession of a controlled substance pursuant to a lawful order of a practitioner does not constitute a violation of the Controlled Substances Act.'" (quoting Ala. Code § 20-2-51)); *McCoy v. State*, 56 So. 3d 37, 39 (Fla. Dist. Ct. App. 2010); (noting the defendant's claim she was holding her husband's pills on his behalf, "if taken as true," provided a defense to possession charge as husband's agent under Florida law); *State v. Jaushlin*, No. 104,195, 2011 WL 5833291, at *3, *6 (Kan. Ct. App. Nov. 18, 2011) (finding trial counsel ineffective in failing to request a jury instruction on lawful possession defense based upon an ultimate user definition where substantial evidence at trial supported the theory); *State v. Faggin*, 150 So. 3d 298, 299 (La. 2014) (noting the defendant's claim she lived with the prescription holder and acted as an agent for him in

retrieving pills on his behalf was a defense on the merits for a fact finder at trial). Construing Iowa law in conjunction with these decisions, we conclude chapter 124 provides an "ultimate user" exception as set forth in *Blocker*, 133 S.W.2d at 505.

This conclusion is required by *State v Gibbs*, 239 N.W.2d 866 (Iowa 1976). In that case, the defendant was convicted of possession of a controlled substance, amphetamines. *See id.* at 867. At trial, the State did not produce any evidence regarding whether the defendant had a valid prescription for the amphetamines. The defendant rested without presenting any evidence. In post-trial motion and on appeal, the defendant contended the State was required to prove that he did not obtain the amphetamines, "'directly from, or pursuant to, a valid prescription . . . or except as otherwise authorized by this chapter.'" *Id.* The State contended that it was not required to negate the prescription exception, relying on the following statutory language:

> It is not necessary for the state to negate any exemption or exception set forth in this chapter in any complaint, information, indictment or other pleading or in any trial, hearing, or other proceeding under this chapter. The proof of entitlement to any exemption or exception by the person claiming its benefit shall be a valid defense.

Iowa Code § 204.507(1) (1973) (recodified at Iowa Code § 124.507). The court held that possessing the controlled substances pursuant to a valid prescription was an exception to rather than an element of the offense. The court further held that where the defendant presented some evidence the circumstances fell within the exception then the State was "obligated to assume the burden to negate the exception beyond a reasonable doubt." *Gibbs*, 239 N.W.2d at 869.

The same result should obtain here. We conclude Gallardo was entitled to argue this theory to the jury and to have the jury so instructed. Where, as here, the defendant presented some evidence that he was an "ultimate user," the State has the constitutional burden of coming forth with evidence to negate the exception beyond a reasonable doubt. To come within the exception, the defendant would have to introduce some evidence establishing each of the following: (1) the controlled substance was obtained pursuant to a valid prescription; (2) the defendant came into lawful possession of the controlled substance; and (3) the defendant lawfully possessed the controlled substance for his or her own lawful use pursuant to a valid prescription or for the lawful use of a member of the defendant's household pursuant to a valid prescription. Conversely, because all three of the foregoing elements must be established to fall within the exception, the State could negate the exception beyond a reasonable doubt by disproving one or more of the elements.

IV.

If the evidence is legally insufficient to support Gallardo's convictions, double jeopardy precludes retrial. *See State v. Reeves*, 670 N.W.2d 199, 201 (Iowa 2003). Therefore, we must consider Gallardo's claim the trial court erred in denying his motion for judgment of acquittal because the evidence is insufficient to rebut the presumption he was an "ultimate user." "'[A] conviction rests upon insufficient evidence when, even after viewing the evidence in the light most favorable to the prosecution, no rational factfinder could have found the

defendant guilty beyond a reasonable doubt.'" *Id.* at 202 (quoting *Tibbs v. Florida*, 457 U.S. 31, 37-38 (1982) (alteration in original)).

When all the evidence in the record is viewed in the light most favorable to the State, there is substantial evidence upon which a rational factfinder could have found Gallardo guilty beyond a reasonable doubt. Gallardo arrived at a hotel known for drug activity at the room of an admitted opiate addict with a bottle of opiates in his pocket. Methamphetamine was discovered in the room, and Gallardo exhibited behaviors of a person using methamphetamine. On this basis, a reasonable factfinder could infer Gallardo went to the hotel room with an unlawful purpose for the prescription morphine in mind. Substantial evidence in the record justifies an inference Gallardo is guilty, and therefore, the motion for judgment of acquittal was properly denied. *See State v. Ellis*, 578 N.W.2d 655, 658 (Iowa 1998) (stating that if there is substantial evidence justifying an inference of guilt, the motion for judgment of acquittal must be denied).

V.

We affirm the ruling on Gallardo's motion to suppress the evidence procured during the stop and search of his person at the American Inn. We reverse Gallardo's convictions for possession of a controlled substance and a drug tax stamp violation. The case is remanded for new trial to allow Gallardo to present evidence related to the "ultimate user" exception. Accordingly, we need not consider Gallardo's remaining claims on appeal.

**REVERSED AND REMANDED.**

McDonald, J., dissents.

**MCDONALD, J., DISSENTING**

I respectfully dissent. The defendant failed to preserve error on the challenge to the jury instructions. While the colloquy regarding the instructions is messy, ultimately defense counsel stated, "I am not objecting to the instructions as submitted." He also failed to submit a proposed instruction incorporating the ultimate user exception. I cannot conclude the district court abused its discretion in refusing to give an instruction when no such instruction was provided to the district court. In light of the failure to preserve error on the instruction, I also conclude the district court did not err or abuse its discretion in denying Gallardo's motions. There was sufficient evidence to support the convictions on the instructions given. The remainder of the defendant's arguments is without merit. I would affirm the defendant's convictions and sentences.