# IN THE SUPREME COURT OF IOWA

No. 21–0664

Submitted March 24, 2022—Filed May 27, 2022

**STATE OF IOWA,**

Appellee,

vs.

**PAMELA MILDRED MIDDLEKAUFF,**

Appellant.

---

Appeal from the Iowa District Court for Warren County, Kevin A. Parker, District Associate Judge.

The defendant appeals a conviction for possession of marijuana, arguing she had a valid prescription or order of a practitioner to possess marijuana. **AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which Waterman, McDonald, and Oxley, JJ., joined. Mansfield, J., filed a dissenting opinion, in which Appel and McDermott, JJ., joined.

Katherine Sears (argued) of Clark and Sears Law, PLLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau (argued), Assistant Attorney General, for appellee.

**CHRISTENSEN, Chief Justice.**

In this case, we visit whether an out-of-state registry card allowing its cardholder to legally purchase and possess medical marijuana in that state and the written certification necessary to get the card are a valid prescription or order of a practitioner to constitute an affirmative defense under Iowa Code section 124.401(5) (2019). An out-of-state defendant was driving through Iowa when an Iowa trooper stopped her for speeding. During the stop, the trooper smelled marijuana coming from the defendant's vehicle and asked if she had been smoking. She denied smoking marijuana but admitted possessing marijuana flowers. The defendant voluntarily gave the trooper her marijuana. She also provided the trooper with a current Patient Medical Marijuana Registry Identification Card issued by the Arizona Department of Health Services. This card allows her to legally purchase a limited amount of marijuana from an Arizona dispensary and possess that marijuana for medical use in Arizona. In obtaining this registry card, she filed an application with the Arizona Department of Health Services, which required a written certification completed by a licensed Arizona physician and other personal information. The written certification was not provided to the trooper at the time of the stop.

The defendant was subsequently charged with possession of marijuana under Iowa Code section 124.401(5). During pretrial motions, she argued that her registry card or the written certification completed by a physician was "a valid prescription or order of a practitioner" to satisfy an affirmative defense in section 124.401(5). The district court determined that the registry card and

written certification were not a valid prescription or order and barred their admissions during the trial. A jury convicted the defendant of possession of marijuana.

On our review, we affirm the defendant's conviction because the registry card and written certification are not a valid prescription or order.

### I. Background Facts and Proceedings.

The defendant, Pamela Middlekauff, lives in Arizona. She suffers from osteoarthritis in her right hand and degenerative joint disease in her left thumb that cause chronic pain. In July of 2018, Middlekauff applied for and was issued a Patient Medical Marijuana Registry Identification Card (registry card) from the Arizona Department of Health Services. Middlekauff's registry card allows her to purchase and possess marijuana products from Arizona dispensaries.

While driving through Iowa from Arizona on December 23, 2019, Middlekauff was stopped by Trooper Luke Valenta for speeding. Trooper Valenta approached the passenger side to obtain Middlekauff's driver information and smelled marijuana coming from her vehicle. He asked Middlekauff if she had smoked marijuana in the vehicle. She denied that she had smoked any marijuana but candidly admitted possessing "quite a bit of marijuana."

Trooper Valenta asked Middlekauff for the marijuana. Middlekauff voluntarily handed him a large open pouch, from underneath a blanket on the passenger seat, containing ten individual one-gram pouches of marijuana flowers. She told him again that the individual pouches contained marijuana

and referred to the marijuana as her medicine. Middlekauff also provided Trooper Valenta with her registry card.

Trooper Valenta took the marijuana back to his car. Upon returning to Middlekauff's car, he issued citations for speeding and marijuana possession. He retained the marijuana flowers as evidence and allowed Middlekauff to leave, as she showed no signs of impairment. The State subsequently charged Middlekauff by trial information with possession of a controlled substance under Iowa Code section 124.401(5). Middlekauff pleaded not guilty.

Middlekauff filed several pretrial motions. The first two motions claimed dismissal was required because the marijuana "was obtained directly from, or pursuant to, a valid prescription or order of a practitioner" under section 124.401(5) or that the registry card was entitled to reciprocity under section 124E.18 of Iowa's Medical Cannabidiol Act. Middlekauff also filed a motion to suppress the marijuana, arguing Trooper Valenta lacked probable cause to seize the marijuana after she presented her registry card to him. The State resisted. The district court denied each of these motions, and we denied interlocutory appeal.

Middlekauff then filed a third motion to dismiss, reiterating claims previously made as well as adding new claims, including: defects in the trial information, the prosecution lacked probable cause, section 124.401(5) was impermissibly vague, and equal protection challenges. The State resisted. The district court denied her third motion to dismiss and we again denied interlocutory appeal.

Before the jury trial, the State filed a motion in limine to exclude any reference to the registry card as well as related Arizona statutes. Middlekauff also filed a motion in limine to exclude testimony from the state's Department of Criminal Investigations (DCI) analyst and any lab report written by the analyst. The district court ruled that there would be no mention of either the registry card or Arizona statutes. Furthermore, the district court declined to exclude the DCI analyst's testimony or the lab report.

Before the trial began, Middlekauff's counsel presented an offer of proof with testimony by Middlekauff and Trooper Valenta to explain how the exclusion of the registry card and relevant Arizona statutes violated her constitutional rights and ability to conduct a defense. At trial, the jury heard testimony from DCI analyst Megan Reedy, Trooper Valenta, and Middlekauff. The jury returned with a guilty verdict and the district court sentenced Middlekauff later that same day upon her request for immediate sentencing. Middlekauff filed a timely appeal, which we retained.

## II. Standard of Review.

We review statutory interpretation issues and motions to dismiss trial information for correction of errors at law. *State v. Wilson*, 941 N.W.2d 579, 584 (Iowa 2020); *State v. Wells*, 629 N.W.2d 346, 351 (Iowa 2001) (en banc). We review decisions regarding the admission of testimony beyond the scope of the minutes of testimony and chain of custody issues for an abuse of discretion. *State v. Braun*, 495 N.W.2d 735, 741 (Iowa 1993); *State v. Bakker*, 262 N.W.2d

538, 543 (Iowa 1978). Finally, we review constitutional issues de novo. *Wilson*, 941 N.W.2d at 585.

### III. Analysis.

Middlekauff presents various challenges on appeal. First, she claims that her registry card or written certification satisfies the "valid prescription or order" affirmative defense under section 124.401(5). Alternatively, Middlekauff raises constitutional issues if the registry card or written certification does not meet the affirmative defense. Second, she raises two evidentiary issues related to whether the DCI analyst should have testified when the analyst's name was not provided in the minutes of testimony and whether chain of custody issues should have prevented the admission of the DCI lab report and marijuana.

**A. Valid Prescription or Order Affirmative Defense and Related Challenges.** Chapter 124 of the Iowa Code (Iowa CSA) mirrors 21 U.S.C. ch. 13, the Federal Controlled Substances Act (Federal CSA) to regulate the "control of certain drugs and other substances affecting the public health." *State v. Gibbs*, 239 N.W.2d 866, 867 (Iowa 1976) (quoting S.F. 1, 64th G.A., 1st Sess. ch. 148 (Iowa 1971)); *see State v. Rasmussen*, 213 N.W.2d 661, 665 (Iowa 1973). To regulate and control certain drugs, the Iowa Code and federal law classify drugs into separate schedules, I through V, based on the drug's potential for abuse and acceptable use for medical treatment or accepted safety in medical treatment. Iowa Code §§ 124.201–212; *see* 21 U.S.C. § 812; *see also State v. Bonjour*, 694 N.W.2d 511, 512–13 (Iowa 2005). Drugs included in these schedules are called "controlled substances." Iowa Code § 124.101(5). Under both Iowa and federal

law, marijuana was listed as a schedule I controlled substance at the time of Middlekauff's traffic stop and remains listed as such today. *Compare* Iowa Code § 124.204(4)(*m*) (2019),[1] *and* 21 U.S.C. § 812(c)(c)(10) (2019), *with* Iowa Code § 124.204(4)(*m*) (2022), *and* 21 U.S.C. § 812(c)(c)(10) (2022).

"It is unlawful for any person knowingly or intentionally to possess a controlled substance . . . ." Iowa Code § 124.401(5) (2019); *see* 21 U.S.C. § 844(a) (2014). However, possession of a controlled substance is legal if it "was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of the practitioner's professional practice, or except as otherwise authorized by this chapter." Iowa Code § 124.401(5); *see* 21 U.S.C. § 844(a). A valid prescription or order of a practitioner is an affirmative defense to possession of a controlled substance. *Gibbs*, 239 N.W.2d at 868. An out-of-state practitioner does not need to be registered with the Iowa Board of Pharmacy for ultimate users to possess a valid prescription or order for controlled substances. *Cf. Rasmussen*, 213 N.W.2d at 665–66.[2]

---

[1]In 2019, marijuana was listed as a schedule I controlled substance "except as otherwise provided by rules of the board [of pharmacy] for medicinal purposes." Iowa Code § 124.204(4)(*m*). Thus, marijuana was a schedule II controlled substance "when used for medicinal purposes pursuant to rules of the board [of pharmacy]." *Id.* § 124.206(7)(*a*). The exception relating to the rules of the board of pharmacy was eliminated on June 1, 2020. 2020 Iowa Acts, ch. 1023, §§ 3, 8 (codified at Iowa Code §§ 124.204(4)(*m*), .206(7) (2020)). Neither of the parties argued or identified any board rules in the district court or on appeal that would make the marijuana possessed in this case a schedule II controlled substance. We move forward with the understanding that the marijuana in this case was a schedule I controlled substance.

[2]We assume without deciding that the physician who completed Middlekauff's written certification is a practitioner. However, we note that an out-of-state practitioner must be registered in compliance with the Federal CSA to validly prescribe or order a controlled substance. *Rasmussen*, 213 N.W.2d at 668; *see* 21 U.S.C. §§ 802(21) (defining practitioner), 822(a)(2) (requiring all practitioners who dispense a controlled substance to be registered with the Attorney General through the Drug Enforcement Agency), 823(f) (requiring separate registration to handle a schedule I controlled substance).

1. *The valid prescription or order of a practitioner defense does not apply here.* Neither the Iowa CSA nor the Federal CSA explicitly define "prescription" or "order." Iowa Code § 124.101; 21 U.S.C. § 802; *but see* 21 C.F.R. § 1300.01 (2019) ("Prescription means an order for medication which is dispensed to or for an ultimate user but does not include an order for medication which is dispensed for immediate administration to the ultimate user (e.g., an order to dispense a drug to a bed patient for immediate administration in a hospital is not a prescription)."). We also have no Iowa caselaw that explains the contours of the valid prescription or order affirmative defense for section 124.401(5). Middlekauff urges us to hold that her registry card, or the written certification necessary to get the registry card, constitutes a valid prescription or order.

To acquire a registry card in Arizona, a qualifying patient with a "debilitating medical condition" must obtain a written certification from a physician. Ariz. Rev. Stat. § 36-2801(20) (2019); *see also id.* § 36-2801(3) (defining debilitating medical condition), (14) (defining physician), (15) (defining qualifying patient). The "written certification" is "a document dated and signed by a physician, stating that in the physician's professional opinion the patient is likely to receive therapeutic or palliative benefit from the medical use of marijuana." *Id.* § 36-2801(20). The physician must also specify the patient's debilitating medical condition for which medical marijuana will be used and ensure that the written certification is only obtained in the course of the physician–patient relationship after reviewing the patient's medical history. *Id.* § 36-2801(20)(a–b).

The written certification is part of a qualifying patient's broader application to the Arizona Department of Health Services. *Id.* § 36-2804.02(A) (requiring an application fee and personal information). If approved, the qualifying patient is issued a registry identification card or an Arizona registry card. *Id.* §§ 36-2804.03(A) (describing the card issuance process), .04(A) (describing the card). This registry card contains the name, address, and date of birth of the cardholder, a statement of whether they are a qualifying patient, issuance and expiration date, a unique identification number, a photograph of the cardholder, an indication if they are permitted to cultivate marijuana, and a pregnancy warning. *Id.* § 36-2804.04(A). Middlekauff's registry card also contains several other warnings, including a warning that "[p]ossessing marijuana may violate local, state, and federal laws, and this card may not provide legal protection." The cardholder is allowed to purchase up to 2.5 ounces of medical marijuana every two weeks from Arizona dispensaries. *Id.* § 36-2806.02(A)(3).

Middlekauff primarily argues that her registry card or the written certification is "an instruction written by a medical practitioner that authorizes a patient to be provided a medicine or treatment" or "a recommendation that is authoritatively put forward" based on dictionary definitions of "prescription." The State uses the Iowa sales tax statutes to define "prescription" as "an order, formula, or recipe issued in any form of oral, written, electronic, or other means of transmission by a practitioner." Iowa Code § 423.3(60)(*f*). Alternatively, the State points to chapter 155A, which regulates pharmacies, to define a prescription. *Id.* §§ 155A.3(41) (defining prescription drug order), .27 (providing

the requirements for a prescription). Middlekauff also claims that the registry card or written certification qualifies as an order from a practitioner.[3]

"The first step in our statutory interpretation analysis is to determine whether the statute is ambiguous." *State v. Zacarias*, 958 N.W.2d 573, 581 (Iowa 2021) (quoting *State v. Ross*, 941 N.W.2d 341, 346 (Iowa 2020)). "Our inquiry ends with the plain language if the statute is unambiguous." *Id.* A statute is ambiguous " 'if reasonable minds could differ or be uncertain as to the meaning of the statute' based on the context of the statute." *Id.* (quoting *Ross*, 941 N.W.2d at 346). If a statute is ambiguous, we "rely on principles of statutory construction to resolve the ambiguity." *Id.* (quoting *Ross*, 941 N.W.2d at 346). Reasonable minds could differ as to whether the registry card or the written certification is a valid prescription or order. Therefore, we proceed with our tools of statutory construction.

If the legislature has not provided a definition, we may refer "to prior decisions of this court and others, similar statutes, dictionary definitions, and common usage." *Good v. Iowa Dep't of Hum. Servs.*, 924 N.W.2d 853, 860 (Iowa 2019) (quoting *State v. Romer*, 832 N.W.2d 169, 179 (Iowa 2013)). However, "[t]he legislature is, of course, entitled to act as its own lexicographer." *Ross*, 941 N.W.2d at 347 (quoting *Porter v. Harden*, 891 N.W.2d 420, 427 (Iowa 2017)). We

---

[3]There are concerns as to whether Middlekauff adequately preserved error or waived this issue. She did not suggest any definition of "order" or provide supporting caselaw in the proceedings below. The only case explaining order as synonymous with a doctor's authorization was first raised in oral argument to this court through the notice of additional authorities. Despite the thinly developed record, we will proceed with whether the registry card or written certification can be considered an order under section 124.401(5).

also interpret section 124.401(5) "by considering its terms in pari materia with the other provisions of chapter [124] and all other pertinent statutes." *State v. Byers*, 456 N.W.2d 917, 919 (Iowa 1990). Our interpretations should also be consistent with the Federal CSA. *Rasmussen*, 213 N.W.2d at 665.

"We apply the rule of lenity in criminal cases, but we only do so as a last resort." *Zacarias*, 958 N.W.2d at 581; *see State v. Welton*, 300 N.W.2d 157, 160 (Iowa 1981). We still must interpret criminal statutes "reasonably and in such a way as to not defeat their plain purpose." *Zacarias*, 958 N.W.2d at 581–82 (quoting *State v. Coleman*, 907 N.W.2d 124, 136 (Iowa 2018)). "It is not our role to 'change the meaning of a statute.' " *Id.* at 582 (quoting *Ross*, 941 N.W.2d at 347).

a. *Neither the registry card nor the written certification is a prescription.* We first analyze whether the Arizona registry card or written certification is a prescription. Iowa Code chapter 124, subchapter III regulates the manufacture, distribution, and dispensing of controlled substances. Iowa Code §§ 124.301–308; *see also* 21 U.S.C. §§ 821–832. Specifically, Iowa Code section 124.308 is entitled, "Prescriptions." It states:

> Except when dispensed directly by a practitioner to an ultimate user, a prescription drug as defined in section 155A.3 that is a controlled substance shall not be dispensed without a prescription. The prescription must be [1] authorized by a practitioner and [2] must comply with this section, section 155A.27, applicable federal law and regulation, and rules of the [board of pharmacy].

*Id.* § 124.308(1). Under section 155A.27, entitled, "Requirements for prescription," a prescription must have the date of issue, name and address of the patient for whom the drug is dispensed, the name, strength, and quantity of

the drug prescribed, directions for use of the prescribed drug, and identification of the prescriber. *Id.* § 155A.27(4)(*a*)(1)–(5). The Arizona Revised Statutes and the Code of Federal Regulations contain similar requirements for a prescription. *See* Ariz. Rev. Stat. § 32-1968(C); 21 C.F.R. § 1306.05.

Nevertheless, there are clear differences between what is included on a registry card and what is required for a prescription under Iowa and Arizona law and federal regulations. The registry card provides neither the specific name, strength, and quantity of the marijuana nor directions for use of the marijuana. *Compare* Iowa Code § 155A.27(4)(*a*)(1)–(5), Ariz. Rev. Stat. § 32-1968(C), *and* 21 C.F.R. § 1306.05, *with* Ariz. Rev. Stat. § 36-2804.04(A). Similar issues exist with the written certification. *Compare* Iowa Code § 155A.27(4)(*a*)(1)–(5), Ariz. Rev. Stat. § 32-1968(C), *and* 21 C.F.R. § 1306.05, *with* Ariz. Rev. Stat. § 36-2801(20).

The Arizona Supreme Court itself has explained that an Arizona registry card is not a "prescription," rejecting a defendant's request to dismiss his driving under the influence charge based on his claim that his registry card was a prescription. *Dobson v. McClennen,* 361 P.3d 374, 377–78 (Ariz. 2015); *see* Ariz. Rev. Stat. § 28-1381(D) ("A person using a drug as prescribed by a medical practitioner . . . is not guilty of [OWI]."). The court explained that "[m]edical marijuana [is] used pursuant to 'written certifications' under the [Arizona Medical Marijuana Act] [and] is not 'prescribed.' " *Dobson,* 361 P.3d at 377 (citing Ariz. Rev. Stat. §§ 36-2801(18), 2804.02(A)(1)). Relatedly, the written certification in Iowa necessary to get an Iowa medical cannabidiol card specifically states, in bold and capitalized letters, "**THIS DOES NOT CONSTITUTE A PRESCRIPTION**

**FOR CANNABIDIOL or MEDICAL MARIJUANA.**" Iowa Dep't of Pub. Health, *Medical Cannabidiol – Health Care Practitioner Certification Form* 2 (2021), https://idph.iowa.gov/Portals/1/userfiles/234/Files/v7_QR%20Healthcare%20Practitioner%20Certification%20Form.pdf; *see* Iowa Code § 124E.3. We conclude that neither the registry card nor the written certification is a prescription.

b. *Neither the registry card nor the written certification is an order.* Under the affirmative defense language of section 124.401(5), prescription and order are separated by the word "or," which means they each have separate meaning. *Bates v. United Sec. Ins.*, 163 N.W.2d 390, 398 (Iowa 1968) ("As used in its ordinary sense the word 'or' marks an alternative indicating the various members of the sentence which it connects are to be taken separately."). We believe an order, in the context of the controlled substances, refers to either a controlled substance being directly dispensed by a practitioner to a patient or a medication order for the administration of controlled substances in the inpatient or institutional health setting. Middlekauff fails to show that either of these definitions would apply.

As an initial matter, we think how Middlekauff received her marijuana would require a prescription rather than just an order of a practitioner under the Iowa CSA. Iowa Code 124.308(1) states, "Except when dispensed directly by a practitioner to an ultimate user, a prescription drug as defined in section 155A.3 that is a controlled substance shall not be dispensed without a prescription." To "dispense" is to "deliver a controlled substance to an ultimate

user or research subject by or pursuant to the lawful order of a practitioner." *Id.* 124.101(9). Deliver "means the actual, constructive, or attempted transfer from one person to another of a controlled substance." *Id.* 124.101(7). A transfer of a controlled substance from one person to another occurred when Middlekauff, as the ultimate user, presented her registry card to an employee at the Giving Tree Dispensary in Arizona to purchase the marijuana. So, even assuming that she had a lawful order from a practitioner, she still needed a prescription under section 124.308(1) because controlled substances were transferred from one person to an ultimate user or dispensed. As we established in part III.A.1.a, Middlekauff has not shown that the registry card or the written certification is a prescription.

But we also do not think Middlekauff could possess marijuana pursuant to a lawful order of a practitioner under the Iowa CSA. An order could act as an affirmative defense to a possession charge if the controlled substance was "dispensed directly by a practitioner to an ultimate user" under 124.308(1). That was not the case here, as no practitioner directly transferred marijuana to Middlekauff. Any direct transfer of marijuana came from a dispensary employee to Middlekauff. Middlekauff has not shown that this exception would apply.

Alternatively, an individual can possess controlled substances pursuant to a "medication order," which is used for the administration of controlled substances in the inpatient or institutional setting. Jane F. Bowen, *Prescription and Medication Orders, in Pharmaceutical Calculations* 17, 17 (2016) ("Prescriptions are used in the outpatient, or ambulatory setting, whereas

medication orders are used in the inpatient or institutional health system setting."). This distinction tracks with the Code of Federal Regulations, which defines a "prescription" as an order for a medication being dispensed but not as an order for immediate administration, such as a bed patient in a hospital. 21 C.F.R. § 1300.01. In the Iowa Code, " '[a]dminister' means the *direct application* of a controlled substance . . . to the body of a patient or research subject." Iowa Code § 124.101(1) (emphasis added); *see* 21 U.S.C. § 802(2) (defining administer); *see also* 21 C.F.R. § 1306.11(b) ("An individual practitioner may *administer or dispense directly* a controlled substance listed in Schedule II in the course of his professional practice without a prescription . . . ." (emphasis added)), *id.* § 1306.21(b) (same for schedule III, IV, and V).

This subtle difference is also recognized in the Iowa Pharmacy Practice Act (Pharmacy Act), which separately describes prescription drug orders and medication orders. *Compare* Iowa Code § 155A.3(42) (" 'Prescription drug order' means a written, electronic, or facsimile order from a practitioner or an oral order from a practitioner or the practitioner's authorized agent who communicates the practitioner's instructions for a prescription drug or device to be dispensed."), *with* Iowa Code § 155A.3(29) (" 'Medication order' means a written order from a practitioner or an oral order from a practitioner or the practitioner's authorized agent for *administration* of a drug or device." (emphasis added)). "Dispense" in the Pharmacy Act is defined as the "means to deliver a prescription drug, device, or controlled substance to an ultimate user or research subject by or pursuant to the *lawful prescription drug order or medication order* of a practitioner." *Id.*

§ 155A.3(12) (emphasis added). It is clear that in this case, Middlekauff was not in any inpatient or institutionalized setting waiting for the direct application of a controlled substance. Rather, her medical marijuana was dispensed by a dispensary in an outpatient setting.

Another hurdle to a claim that the registry card or written certification is a medication order is that medication orders have similar labeling requirements to a prescription (drug name, strength, and dosage, as well as directions for use). *See* Iowa Code § 155A.27(4)(*a*)(3)–(4); Iowa Admin. Code r. 657—7.13(1)(*b*)–(*c*) (2019). As described above, the registry card and written certification both fail to meet these requirements.

The board of pharmacy, given rulemaking authority under Iowa Code section 124.301, has created rules that "establish[] the minimum standards for *any activity* that involves controlled substances." Iowa Admin. Code r. 657—10.1 (emphasis added). In this particular administrative chapter, rules for medication orders of controlled substances exist and are separate from prescriptions for controlled substances. *Compare* Iowa Admin. Code r. 657—10.28 (describing medication orders for schedule II controlled substance)*, with* Iowa Admin. Code r. 657—10.29 (describing refilling prescriptions for schedule II controlled substances). If the board of pharmacy is separately describing the two in an administrative chapter that sets the minimum standards for any activity relating to controlled substances, then its distinction must be taken into consideration. Additionally, there is a strong connection between the Pharmacy Act and the Iowa CSA. The requirements for a prescription under the Iowa CSA are directly

derived from the Pharmacy Act. *See* Iowa Code § 124.308(1); *id.* §§ 155A.3, .27. The Pharmacy Act's definition of "medication order" is certainly relevant to our determination of what an "order" is.

Meanwhile, the dissent looks elsewhere in the Iowa Code for support that an "order" is "in reference to a physician in other contexts without tying it to an inpatient or institutional setting," focusing instead on chapters 135C and 152D. The problem is that those sections deal with what an order is "in other contexts." They are irrelevant to the highly regulated nature of dispensing controlled substances because they do not take section 124.308(1)'s prescription requirement or its direct dispensing exception into account.

The dissent also claims an order "is certainly a broad enough term to encompass a certification form that enables the purchase of something." This definition of order is unsupported by Iowa, sister states, or federal statutory analysis, relevant regulations, or caselaw in the context of controlled substances, and the dissent fails to reconcile its definition with the prescription requirement in Iowa Code section 124.308(1). But even if the dissent's definition was correct, its conclusory logic is unconvincing. A completed certification form, standing on its own, would not enable Middlekauff to purchase medical marijuana at any Arizona medical marijuana dispensary. The registry card authorized by the State of Arizona, not a practitioner, is what enables the purchase of medical marijuana. The dissent's argument is comparable to providing a completed credit card application to a store clerk, rather than an actual credit card, when trying to purchase something. It is the credit card that enables the purchasing of

something—not the completed application. While the written certification is necessary for the registry card, it is the registry card that enables the purchase of medical marijuana.

The dissent's claim that the written certification is comparable to a "purchase order" is misplaced. If "order" in section 124.401(5) goes beyond the medical treatment with a controlled substance to be considered a purchase order, the dissent ignores the fact that purchase orders under the Federal CSA already exist. The Federal CSA has a specific purchase order form for controlled substances that practitioners use called, "DEA Form 222," as well as a comparable electronic ordering service called, "DEA Controlled Substances Ordering System" (CSOS). 21 U.S.C. § 828(a); *see generally* 21 C.F.R. §§ 1305.01–20 (providing regulations related to DEA Form 222); *id.* §§ 1305.21–.29; *id.* § 1311 (providing regulations related to the CSOS). The DEA Form 222 and CSOS are relevant to both Iowa and Arizona CSA law because both states use that order form as the exclusive means to distribute controlled substances. *See* Iowa Code § 124.307 ("Controlled substances in schedules I and II shall be distributed by a registrant to another registrant only pursuant to an order form. Compliance with the provisions of federal law respecting order forms shall be deemed compliance with this section."); Ariz. Rev. Stat. § 36-2524 (same). Both Iowa and Arizona administrative rules require compliance with the DEA Form 222 or CSOS. Iowa Admin. Code r. 657—10.17 ("A registrant authorized to order or distribute Schedule I or II controlled substances shall do so only pursuant to and in compliance with DEA regulations via a DEA Form 222 or via the DEA

Controlled Substances Ordering System (CSOS)."); Ariz. Admin. Code § R4-23-1003(B) (2019) ("For purposes of [Ariz. Rev. Stat.] § 36-2524, 'Order Form' means DEA Form 222c.").

Practitioners can only "order" a schedule I controlled substance through these forms if they are registered to do research on a schedule I controlled substance. 21 U.S.C. § 823(f); *see* 21 C.F.R. § 1305.04(a) ("Only persons who are registered with DEA under [21 U.S.C. § 823] to handle schedule I or II controlled substances . . . may obtain and use DEA Form 222 (order forms) or issue electronic orders for these substances."). That *research* registration is distinct from *dispensing* a controlled substance, which is the context in this case. 21 U.S.C. § 823(f); *see Bourgoin v. Twin Rivers Paper Co., LLC,* 187 A.3d 10, 16 n.5 (Me. 2018) ("These prohibitions are subject to one exception, namely, the use of marijuana in research projects approved by the government—a circumstance not present here."). Practitioners can only be registered to dispense controlled substances between schedules II through V—not schedule I. 21 U.S.C. § 823(f). Iowa has a similar provision that differentiates registration regarding dispensing controlled substances between schedules II through V and researching controlled substances in schedule I. Iowa Code § 124.303(3) (requiring federal registration to research schedule I substances); *see also* Ariz. Rev. Stat. § 36-2522(A)(2) (requiring registration under the Federal CSA). Middlekauff has not shown that a practitioner could dispense a schedule I substance pursuant to an "order form" or that Middlekauff's physician ordered the controlled

substance through the proper DEA channels required under Iowa and Arizona law.

After an extensive review of state and Federal CSA caselaw, the Iowa, Arizona, and Federal CSA statutory schemes, and their relevant regulations to ascertain what "order" could mean, no existing concept of "order" that directly supports Middlekauff's thinly developed claim could be located. *E.g. United States v. Harvey*, 659 F.3d 1272, 1274 (9th Cir. 2011) ("Whatever else 'order' might mean under § 844(a) of the Controlled Substances Act, it does not include a mere recommendation from a physician . . . ."). Middlekauff has not shown that a practitioner directly dispensed marijuana to her pursuant to a lawful order to bypass the prescription requirement in Iowa Code section 124.308(1), that she possessed marijuana pursuant to a medication order, or that her physician ordered it through the appropriate DEA channels. Therefore, neither the Arizona registry card nor written certification is an order.

c. *Marijuana cannot be validly prescribed or ordered.* Even if we held that the registry card or written certification is a prescription or order, we are faced with the fact that marijuana, as a schedule I drug, cannot be *validly* prescribed or ordered for medical treatment. While "valid" is also not defined in the Iowa Code, the Code of Federal Regulations defines a "valid prescription" as "issued for a legitimate medical purpose by an individual practitioner licensed by law to administer and prescribe the drugs concerned." 21 C.F.R. § 1300.03. The problem is neither Iowa, Arizona, nor federal law allow prescriptions for schedule I drugs because schedule I drugs, for purposes of the CSA's, have no legitimate

medical use by statutory classification. Iowa Code § 124.308(5)–(7); *see* Ariz. Rev. Stat. § 36-2525;[4] *see also* 21 U.S.C. § 829. Nor does our administrative code provide for rules relating to the prescription of schedule I controlled substances. *See* Iowa Admin. Code r. 657—10.24. The same is true for medication orders. *See id.* r. 657—7.13(1).

"Whereas some other drugs can be dispensed and prescribed for medical use the same is not true for marijuana. Indeed, for purposes of the Controlled Substances Act, marijuana has 'no currently accepted medical use' at all." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 491 (2001) (citation omitted); *see Gonzales v. Oregon*, 546 U.S. 243, 269 (2006) ("Congress' express determination that marijuana had no accepted medical use foreclosed any argument about statutory coverage of drugs available by a doctor's prescription."); *see also Bonjour*, 694 N.W.2d at 514.

As applied to an order from a practitioner, Middlekauff has "not cited any cases that support [her] position that the CSA allows doctors to *order* the use of Schedule I drugs while, at the same time, preventing doctors from *prescribing* them. Nothing in the CSA or any case supports the notion that Congress [or the Iowa legislature] intended 'prescription' and 'order' to have fundamentally contradictory meanings within the same sentence . . . ." *United States v. Harvey*, 794 F. Supp. 2d 1103, 1106 (S.D. Cal. 2011) (emphasis added), *aff'd* 659 F.3d

---

[4]Arizona now allows for recreational marijuana use. *See* Ariz. Rev. Stat. ch. 36-28.2 (2021). However, Arizona still lists marijuana as a schedule I controlled substance through its adoption of the schedule provided in the Code of Federal Regulations. Ariz. Rev. Stat. § 36-2512; Ariz. Admin. Code R4-23-1004 (2022); 21 C.F.R. § 1308.11(d)(23) (2022).

1272 (9th Cir. 2011). Several state courts,[5] not just Wyoming as cited in the dissent, and federal courts[6] have applied a similar analysis to conclude marijuana cannot be validly prescribed or ordered for medical treatment under their CSA's.

---

[5] *Beinor v. Indus. Claim Appeals Off.*, 262 P.3d 970, 974 (Colo. App. 2011) ("Marijuana, in contrast, remains a Schedule I controlled substance under the applicable federal statute and consequently cannot be prescribed."); *Bourgoin*, 187 A.3d at 15 ("[F]ederal law bars the prescribed use of marijuana—and of any other Schedule I drug—even in a state with local laws allowing the medical use of marijuana."); *Wright's Case*, 156 N.E.3d 161, 166 (Mass. 2020) ("Accordingly, as a schedule I drug, marijuana may not be prescribed."); *State v. Thiel*, 846 N.W.2d 605, 612–13 (Minn. Ct. App. 2014) ("Marijuana is classified as a Schedule I substance under Minnesota law . . . . But Schedule II substances can be prescribed in Minnesota, which differentiates Schedule II substances from Schedule I substances." (citation omitted)); *Mont. Cannabis Indus. Ass'n v. State*, 368 P.3d 1131, 1152 (Mont. 2016) ("Because marijuana cannot be prescribed within that regulatory framework, the Legislature imposed instead a series of restrictions to curb widespread distribution and to limit possession of the substance to individuals with debilitating medical conditions for whom there is little or no other effective treatment."); *Hager v. M&K Constr.*, 247 A.3d 864, 882 (N.J. 2021) ("The 'valid prescription' language . . . cannot, however, apply to marijuana because the CSA prevents marijuana from being validly prescribed."); *State v. Kuruc*, 846 N.W.2d 314, 324 (N.D. 2014) ("[I]t does not logically follow that there could be a valid prescription for a substance [(marijuana)] that has no medical use or lacks accepted safety."); *Emerald Steel Fabricators, Inc. v. Bureau of Lab. & Indus.*, 230 P.3d 518, 535 (Or. 2010) (en banc) ("[T]he Controlled Substances Act did not authorize employee's physician to administer (or authorize employee to use) marijuana for medical purposes."); *Dowden v. State*, 455 S.W.3d 252, 256 (Tex. App. 2015) ("THC is a Schedule I controlled substance. . . . Texas law does not authorize prescriptions for Schedule I controlled substances."); *Seeley v. State*, 940 P.2d 604, 607 (Wash. 1997) (en banc) ("Marijuana cannot be legally prescribed, nor can a prescription for marijuana be filled by a pharmacist in Washington unless a federal registration is granted [for research purposes]."); *Green Collar Club v. State Dep't of Revenue*, 413 P.3d 1083, 1090–91 (Wash. Ct. App. 2018) (determining registry card is not a prescription or order under the Washington's tax code); *Burns v. State*, 246 P.3d 283, 286 (Wyo. 2011) ("[I]t would be illegal for a physician to prescribe or order, in any sense, the possession of marijuana.").

[6] *United States v. Schostag*, 895 F.3d 1025, 1028 (8th Cir. 2018) ("Under federal law, marijuana is 'contraband for any purpose,' including for medical purposes."(emphasis omitted) (citations omitted) (quoting *Gonzales v. Raich*, 545 U.S. 1, 27 (2005))); *Harvey*, 794 F. Supp. 2d at 1106 ("The language and provisions of the [Federal] CSA suggest the CSA does not permit practitioners to prescribe Schedule I drugs such as marijuana.");*United States v. Blanding*, No. 3:21–CR–00156 (KAD), 2022 WL 92593, at *2 (D. Conn. Jan. 6, 2022) ("The federal possession statute exempts certain prescribed medicines; *see* 21 U.S.C. § 844(a); but this exemption does not apply to marijuana."); *United States v. Arizaga*, No. 16–CR–89–LTS, 2016 WL 7974826, at *2 (S.D.N.Y. Dec. 22, 2016) ("There is no federal exception for medical marijuana because the statutory prescription exception does not cover Schedule I drugs such as marijuana."); *United States v. Bey*, 341 F. Supp. 3d 528, 528–29 (E.D. Pa. 2018) ("We strongly reminded him the possession, use and distribution of marijuana—even medical marijuana prescribed by a medical provider under Pennsylvania Law—is illegal under federal law.").

We have good reason for holding that marijuana cannot be validly prescribed or ordered. A practitioner cannot dispense controlled substances in schedules II through V without obtaining a registration from the DEA. 21 U.S.C. § 823(f). No similar provision exists for schedule I drugs beyond for research purposes. *Id.* By prescribing or ordering a schedule I substance for medical treatment, practitioners risk having their registration to dispense drugs revoked by the DEA and exposing themselves to an aiding and abetting charge in violation of federal law. *See Conant v. Walters*, 309 F.3d 629, 632–33, 635 (9th Cir. 2002).

Some states have passed legislation to insulate physicians from negative licensing or criminal consequences by having the state authorize medical marijuana outside of their respective CSA statutory schemes. *Mont. Cannabis Indus. Ass'n v. State*, 368 P.3d 1131, 1152 (Mont. 2016). This is similar to how chapter 124E works in Iowa and title 36, chapter 28.1 works in Arizona. *See* Iowa Code ch. 124E; Ariz Rev. Stat. ch. 36-28.1. Under this system, a physician, who may or may not be registered to dispense controlled substances under state or federal law, typically completes a document that states the patient may benefit from medical marijuana use. *See, e.g.*, Ariz. Rev. Stat. § 36-2801(20). This document, the written certification in this case, is essentially a physical manifestation of the physician's and patient's First Amendment right to openly and candidly discuss appropriate medical treatments, including medical marijuana. *Conant*, 309 F.3d at 637–38; *see, e.g., Bourgoin*, 187 A.3d at 16 n.5 ("Thus, a 'written certification' for medical marijuana authorized by the [Maine Medical Use of Marijuana Act], even when issued by a medical 'practitioner' . . . ,

is not a 'valid prescription or order' that would exempt the resulting marijuana possession from the purview of the CSA." (citations omitted)); *Musta v. Mendota Heights Dental Ctr.*, 965 N.W.2d 312, 316 n.2 (Minn. 2021) ("Under Minnesota's THC Act, a physician does not prescribe medical cannabis for a patient's medical condition; rather, the physician determines whether the patient 'suffers from a qualifying medical condition,' which if found allows the patient to apply for enrollment in the medical cannabis program." (citations omitted)). Physicians who complete this document are thereby insulated from revocation of their DEA registration, if they have one, or from being subjected to a federal aiding and abetting charge under the protections of the First Amendment.

Although some states have passed legislation to avoid certain provisions of the Federal CSA and their own CSA's, the legal consequences for prescribing or ordering a schedule I drug, such as marijuana, continue to exist. We conclude that marijuana cannot be *validly* prescribed or ordered for medical treatment under Iowa Code section 124.401(5).

d. *Middlekauff's interpretation would render chapter 124E's specific medical cannabidiol patient possession defense superfluous.* In 2014, the Iowa Legislature enacted its first Medical Cannabidiol Act before passing a more comprehensive Medical Cannabidiol Act in 2017. 2014 Iowa Acts ch. 1125 (codified at Iowa Code ch. 124D (2015)); 2017 Iowa Acts ch. 162 (codified at Iowa Code ch. 124E (2017)). Cannabidiol is found in the marijuana plant. Iowa Code § 124E.2(9)–(10) (defining medical cannabidiol). Specific forms of medical cannabidiol are "recommended by the medical cannabidiol board, approved by

the board of medicine, and adopted by the department pursuant to rule." *Id.* § 124E.2(10); *see* Iowa Admin. Code r. 641—154.1 (listing the approved forms of medical cannabidiol).

Similar to the process of obtaining a registry card in Arizona, Iowans can apply for an Iowa medical cannabidiol card with the Iowa Department of Public Health after obtaining a written certification from a healthcare practitioner. *See* Iowa Code §§ 124E.3 (describing the duties of a healthcare practitioner in providing a written certification), .4 (describing the application process and contents of the Iowa medical cannabidiol card).

The parties agree that because Middlekauff was found with marijuana that did not comport with the approved forms of medical cannabidiol under Iowa law, chapter 124E does not provide a defense. However, a brief discussion of Iowa's Medical Cannabidiol Act is warranted in our analysis.

Two paragraphs below the "valid prescription or order" affirmative defense found in 124.401(5), the legislature included reference to a separate affirmative defense that allows a person to knowingly or intentionally possess medical cannabidiol if the possession "is in accordance with the provisions of chapter 124E." *Id.* § 124.401(5).

> In a prosecution for the *unlawful possession of marijuana* under the laws of this state for *the possession of medical cannabidiol,* including . . . chapter[] 124 . . . it is an affirmative and complete defense to the prosecution that *the patient* [has a debilitating medical condition and a certification by a heathcare practitioner and] is in possession of a valid medical cannabidiol registration card issued pursuant to this chapter.

*Id.* § 124E.12(4)(*a*) (emphasis added). The 124E patient possession defense also applies to out-of-state registry cardholders if the registry card is a medical cannabidiol card, or its equivalent, and the cardholder is in the possession of medical cannabidiol. *Id.* § 124E.18.

If we were to hold that a registry card or written certification is an affirmative defense to possession of marijuana and its derivatives because it is a valid prescription or order, as urged by Middlekauff, then why did the legislature create a specific 124E medical cannabidiol patient possession affirmative defense? Middlekauff's proposed interpretation of the valid prescription or order defense under 124.401(5) would render it superfluous. *Iowa Ins. Inst. v. Core Grp. of the Iowa Ass'n for Just.*, 867 N.W.2d 58, 75 (2015) (explaining the surplusage canon). The legislature drafted two separate affirmative defenses, one under 124.401(5) (valid prescription or order) and one under 124E (medical cannabidiol), and the legislature does not do that for no reason. *Bennett v. Iowa Dep't of Nat. Res.*, 573 N.W.2d 25, 28 (Iowa 1997) ("[T]he . . . expression of one thing is considered the exclusion of another."). Middlekauff's interpretation of the 124.401(5) valid prescription or order defense is irreconcilable with the 124E medical cannabidiol patient possession defense and the Iowa Legislature's attempt to limit that defense for out-of-state cardholders to possessing medical cannabidiol.

Based on the foregoing reasons, we hold that neither the Arizona registry card nor written certification for medical marijuana is a valid prescription or

order under section 124.401(5). The district court did not err in refusing to admit the Arizona registry card or written certification.

2. *The valid prescription or order defense is not unconstitutionally vague.* Middlekauff argues that the valid prescription or order defense is unconstitutionally vague as applied to her. While Middlekauff cited the Iowa Constitution's due process clause in her third motion to dismiss, she does not offer any reason why we should interpret the due process clause in the Iowa Constitution differently than the United States Constitution. Therefore, we treat the provisions as identical. *State v. Nail*, 743 N.W.2d 535, 539 (Iowa 2007).

"The [due process] clause is broad and captures the common concept that all laws are required to give people of ordinary intelligence fair warning of the prohibited conduct . . . ." *State v. Newton*, 929 N.W.2d 250, 255 (Iowa 2019). "[I]n determining whether a statute is unconstitutionally vague, this court presumes the statute is constitutional and gives 'any reasonable construction' to uphold it." *Nail*, 743 N.W.2d at 539 (emphasis omitted) (quoting *State v. Millsap*, 704 N.W.2d 426, 436 (Iowa 2005)). "The United States Supreme Court has repeatedly made clear that vagueness challenges are determined on the basis of statutes and pertinent caselaw rather than the subjective expectations of particular defendants based on incomplete legal knowledge." *Id.* at 540. "A statute may be saved from constitutional deficiency, moreover, if its meaning is fairly ascertainable by reference to other similar statutes or other statutes related to the same subject matter." *Id.*

Middlekauff has failed to show the valid prescription or order defense is impermissibly vague as applied to her. We think a reasonably intelligent person could understand what a valid prescription or order constituted by reading Iowa and federal requirements of a prescription or order, understanding that marijuana—as a schedule I drug—could not be validly prescribed or ordered under either Iowa or federal law, and observing Iowa's Medical Cannabidiol Act in chapter 124E as described above.

3. *Section 124.401(5) does not violate equal protection.* Middlekauff also argues section 124.401(5) violates equal protection under the Federal and State Constitution. Similar to her vagueness challenge, Middlekauff does not claim that we need to interpret the state and federal equal protection protections differently. We treat those provisions as identical.

First, Middlekauff argues that this statute inappropriately discriminates between out-of-state individuals who are authorized to use medical marijuana for a medical condition and out-of-state individuals who are prescribed other controlled substances, particularly opioids, for the same medical condition. Secondly, she argues that this statute improperly discriminates between out-of-state individuals authorized to use medical marijuana flower and Iowans authorized to use medical cannabidiol.

To begin analyzing these equal protection challenges, we must determine whether the state is "treating similarly situated persons differently." *State v. Doe*, 927 N.W.2d 656, 662 (Iowa 2019) (quoting *King v. State*, 818 N.W.2d 1, 24 (Iowa 2012)). "If the two groups are not similarly situated, we need not scrutinize the

legislature's differing treatment of them." *In re Det. of Hennings*, 744 N.W.2d 333, 339 (Iowa 2008). "The purposes of the law must be referenced in order to meaningfully evaluate whether the law equally protects all people similarly situated with respect to those purposes." *Tyler v. Iowa Dep't of Revenue*, 904 N.W.2d 162, 167 (Iowa 2017) (quoting *Varnum v. Brien*, 763 N.W.2d 862, 883 (Iowa 2009)).

As a threshold matter, we agree with the State that Middlekauff has not shown that her first classification between out-of-state individuals who are authorized to use medical marijuana for a medical condition as compared to out-of-state individuals who are prescribed other controlled substances for the same medical condition are similarly situated. Middlekauff's first classification can be easily distinguished for two reasons. First, as discussed above, the registry card or written certification is not a valid prescription or order. Second, as also discussed above, marijuana, as a schedule I controlled substance, cannot be validly prescribed or ordered, unlike certain opioids under schedule II. *Compare* Iowa Code § 124.204 (schedule I controlled substances), *with id.* § 124.206 (schedule II controlled substances). The legislature may treat these two classes differently, and we do not proceed further on this classification. *See, e.g.*, *Houck v. Iowa Bd. of Pharmacy Exam'rs*, 752 N.W.2d 14, 21 (Iowa 2008) (determining a licensed pharmacist is not similarly situated as a nonpharmacist).

Middlekauff's second classification, Iowans authorized to use medical cannabidiol as compared to out-of-state individuals authorized to use marijuana flower for medical treatment, shows that the two groups are similarly situated.

Marijuana is still a schedule I controlled substance under the Federal CSA and Iowa CSA. However, both individuals are authorized to use certain forms of marijuana for medical treatment. We proceed with this equal protection challenge.

We now must determine what level of scrutiny is involved. "Unless a suspect class or a fundamental right is at issue, equal protection claims are reviewed under the rational basis test." *Doe*, 927 N.W.2d at 662 (quoting *King*, 818 N.W.2d at 25). No suspect class is involved. Middlekauff generally states that fundamental rights are implicated but does not explain what the fundamental right is. The State argues rational basis is appropriate because there is no fundamental right to the possession of marijuana. *See Raich v. Gonzales*, 500 F.3d 850, 866 (9th Cir. 2007). We agree with the State and apply rational basis.

A statute survives rational basis if "the statute serves a legitimate governmental interest, but also that the interest itself is 'realistically conceivable' and has a 'basis in fact.'" *Tyler*, 904 N.W.2d at 166 (quoting *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 7–8 (Iowa 2004)). "[T]he relationship between the classification and the purpose must not be 'so weak that the classification must be viewed as arbitrary.'" *Id.* (quoting *McQuistion v. City of Clinton*, 872 N.W.2d 817, 831 (Iowa 2015)). "The burden is not on the government to justify its action, but for the [defendant] to rebut a presumption of constitutionality." *Id.* (quoting *McQuistion*, 872 N.W.2d at 831). Middlekauff

"must 'negate every reasonable basis upon which the classification may be sustained.'" *Id.* at 166–67 (quoting *Varnum*, 763 N.W.2d at 879).

Marijuana "exudes a resin containing a mix of cannabinoids with principal components, . . . tetrahydrocannbinol (THC) and cannabidiol (CBD)." Christian Larsen & Jorida Shahinas, *Dosage, Efficacy and Safety of Cannabidiol Administration in Adults: A Systematic Review of Human Trials*, 12 J. Clinical Med. Rsch. 129, 129 (2020). Cannabidiol is distinctly different from THC "[b]ecause of its excellent tolerability in humans, the lack of psychoactive action and the low abuse potential." *Id.* The legislature could have plausibly thought the use of cannabidiol had acceptable medical application as compared to marijuana generally. Even though Iowa law now allows for THC in cannabidiol products, THC is capped at a certain amount. *See* Iowa Code § 124E.9(14)–(15) (2021). Iowa's current statutory scheme is rationally related to preventing the proliferation of medical marijuana that has a high or unregulated amount of THC and keeping 124E out of the controlled substances context. *Cf. State v. Biddle*, 652 N.W.2d 191, 203 (Iowa 2002). "Use of marijuana is a public-policy issue best suited for the legislature because it is driven by legal, moral, philosophical, and medical concerns that are ill-suited for resolution by this court." *Bonjour*, 694 N.W.2d at 514. Accordingly, Middlekauff's second classification survives rational basis review.

4. *Remaining arguments related to the valid prescription or order defense do not have merit.* Middlekauff also makes the following arguments on appeal: the trial information contained "uncontested evidence" of the registry card which

meant no probable cause existed for the possession charge so dismissal was required, continued prosecution without probable cause was a seizure in violation of the Fourth Amendment to the United States Constitution, and that the exclusion of the registry card and related Arizona statutes violated her right to present a defense. Each of these arguments assumes that the registry card or written certification is a valid prescription or order under section 124.401(5), which is contrary to our holding today.

The trial information established probable cause for marijuana possession through the minutes of testimony and the attached report describing the stop. *State v. Petersen*, 678 N.W.2d 611, 614 (Iowa 2004). Dismissal of the possession charge was not required and further prosecution was not in violation of the Fourth Amendment. Furthermore, the registry card and written certification were not relevant to the trial and their inclusion would have been prejudicial. The court did not violate Middlekauff's right to present a defense by excluding the registry card and related jury instructions. *See State v. Walton*, 311 N.W.2d 113, 115 (Iowa 1981) ("If all the requirements of the defense are not addressed in the defendant's evidence, trial court is not obligated to submit the issue to the jury.").

**B. Evidentiary Issues.**

1. *Testimony from the DCI analyst was admissible.* Middlekauff claims that the district court should have barred DCI analyst Reedy's testimony because the State did not include her name in the minutes of testimony. In the minutes, "Unknown Criminalist or Designee, Iowa Division of Criminal Investigation,

Criminalistics Laboratory, 2240 South Ankeny Blvd, Ankeny, IA 50023" was included as an expected witness. The minutes explained that this unknown DCI individual would testify to the results of an analysis from the evidence taken by Trooper Valenta.

On May 3, 2021, ten days before the trial, Middlekauff requested that the unknown DCI analyst testify in person pursuant to Iowa Code section 691.2(2) (2019). The prosecutor soon realized that the marijuana had not been sent to the lab for testing, so Trooper Valenta sent the drugs to the DCI lab for analysis. The marijuana flowers were tested and a report was created confirming that the drugs were marijuana. This report and the identity of the DCI analyst were provided to Middlekauff's attorney at the pretrial conference on May 12 at which time the State offered a continuance of the trial. Middlekauff countered with a request to exclude the DCI analyst's testimony. The district court denied Middlekauff's request to exclude the DCI analyst's testimony but agreed to grant a continuance. However, Middlekauff declined the opportunity to continue the trial.

According to the rules of criminal procedure, a prosecuting attorney must provide the names of witnesses who may be called to testify at trial in the minutes of testimony. Iowa Rs. Crim. P. 2.5(3), 2.19(2). However, witnesses not listed in the minutes may testify at trial if the prosecutor gives the defendant's attorney a minute of such witness's testimony at least ten days before trial. *Id.* r. 2.19(2). "The purpose of this requirement is to inform the defendant of the identity of State witnesses and what evidence they will give." *State v. Swallom*, 244 N.W.2d

321, 323 (Iowa 1976). If the prosecutor has not given proper notice for prosecution witnesses, "the court may order the state to permit the discovery of such witnesses, grant a continuance, or enter such other order as it deems just under the circumstances." Iowa R. Crim. P. 2.19(3).

DCI reports have a special relationship to the witness naming requirement for minutes of testimony. "Any report . . . of the criminalistics laboratory shall be received in evidence, if determined to be relevant, in any court . . . in the same manner and with the same force and effect as if the employee or technician of the criminalistics laboratory who accomplished the requested analysis . . . had testified in person." Iowa Code § 691.2(1). As such, the State is not required to name a witness for the admission of a DCI report. *State v. Givens*, 248 N.W.2d 86, 87 (Iowa 1976).

*State v. Thomas* is instructive on Middlekauff's claim. 222 N.W.2d 488 (Iowa 1974) (en banc). In *Thomas*, the defendant, also charged with marijuana possession, contended the trial court erred in permitting a DCI analyst to testify when the DCI analyst's name was not listed on the minutes of testimony. *Id.* at 493. We held that "[w]hile the name of the witness Eck did not appear in the minutes of the testimony, the substance of his testimony did appear, and the defendant therefore had an indication of what the testimony of the chemist would be." *Id.* Similar to *Thomas*, the minutes of testimony here provided a detailed explanation of what the DCI analyst's testimony would entail.

We also held in *Thomas* that "[i]t is obviously inconsistent for the defendant to request the technician to appear, and then object to his

appearance." *Id.* Again, similar to *Thomas*, Middlekauff asked for the DCI analyst to appear. It would have been inconsistent for the district court to then subsequently bar DCI analyst Reedy from testifying. A continuance was reasonable under the circumstances and an appropriate remedy. *See* Iowa R. Crim. P. 2.19(3).

We conclude the district court did not abuse its discretion in overruling Middlekauff's request to bar DCI analyst Reedy's testimony and instead offering a continuance, which Middlekauff declined. Regardless, any error was harmless because Middlekauff conceded during cross-examination that she possessed marijuana.

2. *Chain of custody was sufficiently established.* Last, Middlekauff argues that the DCI lab report and marijuana should not have been admitted because there were two chain of custody issues. First, Trooper Valenta testified that he did not take pictures of the marijuana while the marijuana was in his custody, yet pictures of marijuana were presented at trial. Second, Trooper Valenta's report stated that he collected ten one-gram pouches of "Blueberry Jack" strain marijuana while DCI analyst Reedy testified that she tested various strains including "a Sour Plum, a GC, a Uride Train Haze, and a Platinum Purple Kush."

"The district court has considerable discretion in determining whether the State has shown the chain of custody necessary for admission of physical evidence." *Biddle*, 652 N.W.2d at 196. "It is sufficient to state that in introducing an exhibit of marijuana, which by its nature is susceptible to tampering, the State is required to prove a chain of custody sufficiently elaborate to make it

reasonably probable no tampering or substitution occurred." *State v. Mattingly*, 220 N.W.2d 865, 870 (Iowa 1974). "Absolute certainty is not required." *Bakker*, 262 N.W.2d at 543. The trial court can presume "[s]tate agents would not tamper with the evidence." *State v. Gibb*, 303 N.W.2d 673, 681 (Iowa 1981). "When [the] trial court has determined that the identification of the exhibit is sufficient, contrary speculation affects the weight of the evidence but not its admissibility." *Id.*

The testimony of Trooper Valenta provides a clear chain of custody of the marijuana, starting at his police car at the time of the stop, then being stored in a locked and secure police evidence locker, then hand-delivering the marijuana pouches to the DCI laboratory, and then recollecting the marijuana pouches for the trial. DCI analyst Reedy testified about the process of receiving the marijuana at the lab for analysis and then returning it to Trooper Valenta. The marijuana was accompanied by documentation (evidence receipt, laboratory submission slip, and lab report), which each had clear identification information connecting the marijuana to Middlekauff and Trooper Valenta. Trooper Valenta identified that a "Blueberry Jack" strain was one of the marijuana pouches taken from Middlekauff and testified that he assumed all of them were "Blueberry Jack" at the time he wrote his report. The fact that pictures were taken shows an intent to *preserve* the evidence rather than an intent to *tamper* with the evidence.

The testimony from Trooper Valenta and DCI analyst Reedy was sufficient to show a reasonable probability that evidence tampering did not occur. Concerns regarding when pictures of the marijuana were taken and whether all

of Middlekauff's marijuana pouches were "Blueberry Jack" properly went to the weight of the evidence. The district court did not abuse its discretion in admitting the DCI report or the marijuana based on the chain of custody objection Regardless, any error was harmless because Middlekauff conceded during cross-examination that she possessed marijuana.

**IV. Conclusion.**

For the foregoing reasons, the conviction is affirmed.

**AFFIRMED.**

Waterman, McDonald, and Oxley, JJ., join this opinion. Mansfield, J., files a dissenting opinion, in which Appel and McDermott, JJ., join.

**MANSFIELD, Justice (dissenting).**

Here is the text of the criminal law under which Pamela Middlekauff was prosecuted:

> It is unlawful for any person knowingly or intentionally to possess a controlled substance unless such substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of the practitioner's professional practice, or except as otherwise authorized by this chapter.

Iowa Code § 124.401(5) (2019).

Reading the statute, it appears to me that Middlekauff obtained her marijuana "pursuant to[] a valid . . . order of a practitioner while acting in the course of the practitioner's professional practice." *Id.* Therefore, she was entitled to dismissal of the criminal charge.

In Arizona, to obtain medical marijuana, one has to present a registration card from the Arizona Department of Health Services. Ariz. Admin. Code § R9-17-314(A)(5) (2019). To obtain the registration card, one has to provide to the department a physician certification certifying that the physician has diagnosed a qualifying medical condition for the patient, has established a medical record for the patient, has conducted an in-person physical examination of the patient, and has reviewed the patient's medical records. Ariz. Rev. Stat. § 36-2804.02 (2019); Ariz. Admin. Code § R9-17-202(F)(5). The specific medical condition has to be identified, and the physician must attest that "the qualifying patient is likely to receive therapeutic or palliative benefit from the qualifying patient's medical use of marijuana." Ariz. Admin. Code § R9-17-202(F)(5)(d), (k).

Middlekauff went through that process in July 2019 and had a current registration card at the time she was stopped on Interstate 35. Thus, she had, in the view of Arizona, "a valid . . . order of a practitioner while acting in the course of the practitioner's professional practice" in satisfaction of Iowa Code section 124.401(5).

In fact, no one disputes that Middlekauff obtained the marijuana validly under Arizona law based on the certification of a practitioner that the marijuana would provide medical benefit to her. And no one argues that an otherwise valid out-of-state prescription cannot meet the requirements of the statutory affirmative defense. Similarly, there is no basis for arguing that an otherwise valid out-of-state order cannot meet those requirements as well. Valid means "valid where it was issued."

Unfortunately, Middlekauff has burdened us with a somewhat convoluted argument that she actually had a "prescription" for marijuana. I'm not persuaded by that argument. But she had an "order," which is enough under the statute.

The legislature defined many terms in Iowa Code chapter 124, but it did not define "order." *See* Iowa Code § 124.101 (defining thirty-one different terms other than "order"). When the legislature does not provide a definition, we look first to "the ordinary and common meaning of the words." *State v. Shorter*, 945 N.W.2d 1, 7 (Iowa 2020). A healthcare practitioner's certification (1) that an individual has a medical condition that would be alleviated by marijuana and (2) that authorizes the individual to obtain a card to purchase marijuana for that

medical condition meets this ordinary and common understanding of a healthcare practitioner's order.

Instead of following this straightforward approach, the majority weaves an elaborate web of reasoning borrowed from other laws. According to the majority, that web leads to the ultimate conclusion that order "refers to either a controlled substance being directly dispensed by a practitioner to a patient or a medication order for the administration of controlled substances in the inpatient or institutional health setting." But none of that extra verbiage appears in the statute. It just says "order."

Again, the term "order" is certainly a broad enough term to encompass a certification form that enables the purchase of something. In fact, we commonly refer to such forms as "purchase orders."

The majority relies on a definition of the term "medication order" from another chapter of the Iowa Code. *See* Iowa Code § 155A.3(29). I question the value of that approach; the definitions in chapter 155A are limited to that chapter. *See id.* § 155A.3 ("As used in this chapter . . . ."). But even that definition seems broad enough to encompass the paperwork that Middlekauff had. *See id.* § 155A.3(29) (" '*Medication order*' means a written order from a practitioner or an oral order from a practitioner or the practitioner's authorized agent for administration of a drug or device.").

It's also worth noting that the Iowa Legislature has used the term "order" in reference to a physician in other contexts without tying it to an inpatient or

institutional setting. For example, Iowa Code chapter 152D deals with the licensing of athletic trainers. Section 152D.7(3) states,

> The practice of physical reconditioning shall be carried out under the oral or written orders of a physician or physician assistant. A physician or physician assistant who issues an oral order must reduce the order to writing and provide a copy of the order to the athletic trainer within thirty days of the oral order.

*Id.* § 152D.7(3). As this section suggests, the "order of a physician" can refer to an order addressing (for instance) stretches for athletes to help them recover from athletic injuries. There's no inpatient or institutional setting.[7]

The majority devotes considerable time and effort to demonstrating that Middlekauff's conduct was not permitted under *federal law* or under *other Iowa laws*. That frolic and detour are beside the point. Middlekauff is being prosecuted for violating Iowa Code section 124.401(5), and it is the State's responsibility to demonstrate that her conduct falls within the prohibition of that statute. *See State v. Hall*, 969 N.W.2d 299, 310–11 (Iowa 2022) ("We are not at liberty to read the statute to prohibit conduct not plainly encompassed by its terms.").

The majority says that adopting Middlekauff's position would render the specific affirmative defenses for possessors of cannabidiol under Iowa's medical cannabidiol law superfluous. *See* Iowa Code §§ 124E.12(4)(*a*), .18. True, avoiding

---

[7]The Code contains other examples. For instance, Iowa Code section 135C.3(2) states,

> An admission to the intermediate care facility for persons with mental illness must be based on a physician's written order certifying that the individual being admitted requires no greater degree of nursing care than the facility to which the admission is made is licensed to provide and is capable of providing.

This reference to the "order of a physician" has nothing to do with the inpatient/outpatient distinction that the majority draws. Rather it shows a link between a certification and an order of a physician.

superfluous language is one rule of construction. *See id.* § 4.4. Still, it is not, as Macbeth might say, "the be-all and end-all." William Shakespeare, *Macbeth* act I, sc. 7. "[W]e have never said this rule cannot be overcome by other considerations." *State v. Wilson*, 941 N.W.2d 579, 590 (Iowa 2020). The legislature enacts overlapping criminal laws all the time. We can give it credit for enacting overlapping affirmative defenses.

I'm also not persuaded by the decision of the Wyoming Supreme Court in *Burns v. State*, 246 P.3d 283 (Wyo. 2011). Interpreting a criminal law that is similar to Iowa Code section 124.401(5), that court noted,

> [T]he Colorado law simply allows for a physician to certify that a patient might benefit from the use of marijuana as a medical treatment. Colo. Const. art. XVIII, § 14(c). It is then left entirely up to the patient whether to apply for a medical marijuana registry card from the State of Colorado. It is the State of Colorado that makes the final determination whether the patient qualifies for the registry card, thereby exempting the patient from criminal liability for possessing amounts of marijuana necessary for medicinal purposes. *Id.* Importantly, it is not the action of the physician that determines any potential possession of marijuana by the patient. Clearly, therefore, the physician is not prescribing or ordering the possession of marijuana as contemplated by the language of § 35–7–1031(c). The exception found in § 35–7–1031(c) simply does not apply in this case.

*Id.* at 286 (footnote omitted).

The forgoing reasoning cuts too fine a line for me. The State of Arizona issues the registry card as long as the practitioner's certification is correct and the patient pays the application fee and completes the application. *See* Ariz. Rev. Stat. § 36-2804.02; Ariz. Admin. Code § R9-17-205. So, I think it is fair to say that the marijuana was obtained "pursuant to[] a valid . . . order of a practitioner

while acting in the course of the practitioner's professional practice." Iowa Code § 124.401(5).

Finally, to the extent there remains any reasonable doubt about the correct interpretation of Iowa Code section 124.401(5) after the traditional canons of interpretation have been considered, we should apply the rule of lenity in favor of Middlekauff. *See, e.g.*, *In re Prop. Seized from Bo Li*, 911 N.W.2d 423, 429 (Iowa 2018) ("The State's statutory interpretation . . . would violate 'the rule of lenity, which guides us to resolve ambiguous criminal statutes in favor of the accused.' " (quoting *State v. Hagen*, 840 N.W.2d 140, 146 (Iowa 2013))); *State v. Nall*, 894 N.W.2d 514, 519 (Iowa 2017) ("[U]nder the rule of lenity, we take a narrow approach to construing ambiguous criminal laws."); *State v. Hoyman*, 863 N.W.2d 1, 18 (Iowa 2015) ("[T]he principle that we construe criminal statutes narrowly, otherwise known as the rule of lenity, should be taken into account.").

For the foregoing reasons, I respectfully dissent and would reverse Middlekauff's conviction and sentence.

Appel and McDermott, JJ., join this dissent.